## THE STATE OF IOWA *v.* SHELLEDY.

In a criminal case, it is sufficient cause of challenge to a petit juror, on the part of the state, that he testifies under oath, that he thought he had formed or expressed an unqualified opinion, or belief, that the defendant was guilty or not guilty, of the offense charged; and it need not appear, in order to constitute a good cause of challenge, that the opinion, or belief, formed or expressed by the juror, was in favor of the prisoner.

The question as to the propriety of recalling a petit juror, who has been challenged, and excused from the jury box, for the purpose of permitting the other party to cross-examine him, and thus disprove the challenge, is within the discretion of the district court; and that discretion will not be controlled by the supreme court, unless it be shown to have been greatly abused.

In a criminal case, it is a sufficient cause of challenge, by the state, that a petit juror had formed an unqualified opinion; and no useful purpose is obtained by allowing the juror to state whether the opinion was favorable or unfavorable to the state.

In the absence of any statutory direction, the order of challenging petit

The State of Iowa v. Shelledy.

jurors, and the mode of proceeding in filling up the panel, is left to the discretion of the district court; and unless there has been gross abuse of this discretion, there is no call for the interference of the appellate court. (WRIGHT, C. J., dissenting.)

In the absence of any rule of law upon the subject of challenging petit jurors, and filling up the panel, it is to be presumed that the district court has adopted a rule of its own, and that the same has been followed in impanneling the jury; and where this has been done, no such prejudice has resulted as to require a reversal of the judgment, unless the discretion of the court in the premises, is shown to have been greatly abused. (WRIGHT, C. J., dissenting.)

Where in a criminal case, a petit juror was challenged by the state, on the ground of implied bias, and being sworn as a witness, for the purpose of proving the challenge, stated that he had formed or expressed an unqualified opinion or belief, that the defendant was guilty or not guilty of the offense charged; and where the defendant asked the juror, whether the unqualified opinion that he had formed, was favorable or unfavorable to the state—which question the court refused to permit the juror to answer, and decided that the testimony was sufficient, and allowed the challenge; *Held*, That there was no error in the ruling of the court.

Where two or more persons conspire together, to do an unlawful act, and in the prosecution of the design, an individual is killed, or death ensue, it is murder in all who enter into, or take part in, the execution of the design.

If the unlawful act be a trespass only, to make all guilty of murder, the death must ensue in the prosecution of the design   If the unlawful act be a felony, or be more than a bare trespass, it will be murder in all, although the death happened collaterally, or beyond the original design.

The common law definition of manslaughter, has not been changed by the Code of Iowa.

Where on the trial of an indictment for murder, the court instructed the jury as follows: " Manslaughter is the unlawful and felonious killing of another, without malice, either express or implied.   It differs from murder in this—that though the act which occasions the death be unlawful, or likely to be attended with bodily mischief, yet malice, either express or implied, which is the very essence of murder, is presumed to be wanting; and if, therefore, in doing an unlawful act, or in carrying out an unlawful design, death happen, but without malice, the offense would be only manslaughter—provided, such unlawful act or design be not a felony, because then, the law implies the existence of malice. But if the intent goes no further than to commit a bare trespass, it will be manslaughter; *Held*, That the direction of the court as to what constituted manslaughter, was as favorable to the defendant, as he could in reason require to be given.

Every person is presumed to contemplate the ordinary and natural conse-

The State of Iowa v. Shelledy.

quences of his own acts; and declarations made at the time of the transaction, expressive of its character, motive or object, are regarded as verbal acts, indicating a present purpose and intention, and are, therefore, admissible in proof, like other material facts, as part of the *res gestæ*.

But where the declaration and the act are inconsistent, if the act goes beyond the declaration, or contradicts it, the presumption of intention is to be gathered from the acts of the party, upon the plain and obvious principle that the party must be presumed to intend to do that which he voluntarily and wilfully does in fact do.

Where on the trial of an indictment, in which the defendant and others were jointly indicted for the murder of one W., the court instructed the jury as follow: "That if the jury believe from the evidence that the defendant and others, formed the design of taking the life of the said W., whether by hanging or otherwise; that in pursuance of such design, the defendant and the others went in a body to the house of the said W., armed and resolved, and prepared to resist all opposition; that they obtained possession, by force or otherwise, of the body of said W., and bound the arms of the said W., so as to render him helpless; that after they had so obtained possession of the said W., the said defendant, and those then engaged with him, or any one of them, in the presence and hearing of said W., avowed their purpose to take the life of the said W., by hanging or otherwise; that they forced the said W. into a hack, while thus bound, and started to the timber with him; that while on the road to the timber, and when on the banks of the Iowa river, they cast the said W., while thus bound, into said river, from the said hack, or compelled the said W., by threats, or otherwise, to jump from said hack into said river, and they then and there permitted him to drown, while standing by, and made no effort to rescue the said W., if by reasonable efforts they might have done so, then the said defendant is guilty of murder in the first degree;" *Held*, That the instruction was correct.

And where in the same case, the court further instructed the jury as follows: "That if the jury believe from the evidence, that the defendant and other persons, formed the design of committing personal violence upon the body of the said W., as by lynching or otherwise, but did not design to take his life; that in pursuance of said design, they went in a body to the house of said W., armed and resolved, and prepared, to resist all opposition; that they obtained possession of the person of the said W., and bound his arms, so as to render him helpless; that they forced the said W. into a hack, while thus bound, and started to the timber with him; that before and after they started, one or more thus engaged, in the presence of W. declared that he should be hung, or that he should die before sun-down, or otherwise threatened the life of said W.; that while on the road to the timber, and when on the banks of the

LAW LIBRARY HARVARD LAW SCHOOL

The State of Iowa v. Shelledy.

Iowa river, the said W., while thus bound, and in the custody of the said defendant, and others then engaged with him, entertained a reasonable and well-grounded apprehension—an apprehension justified by the circumstances—that the said defendant and others then engaged with him, intended to commit personal violence on the said W., or to take the life of the said W., and under that apprehension, sprung from the carriage into the said river, hoping either to escape the threatened violence, or apprehended death, and was then and there drowned—the said defendant, and others then engaged with him, standing by, neither rescuing, nor offering to rescue, the said W., then the said defendant is guilty of murder in the second degree;" *Held*, That the instruction was sustained by authority.

Where death ensues in consequence of the unlawful act of another, it is not necessary that the fatal result should have sprung from an act of commission ; but if defendant omitted any act incumbent on him, from which death resulted to the deceased, if there was no malice, it is manslaughter—if there was malice, it is murder.

Where a defendant in a criminal case, seeks to set aside a verdict against him, on the ground that one of the jurors, previous to the trial, had formed or expressed an unqualified opinion that he was guilty of the offense charged, he must show by the record, that the juror was examined upon oath, as to whether he had formed such opinion; and if it is not thus shown, there is no ground for a new trial.

On a motion to set aside a verdict in a criminal case, on the ground that one of the jurors had, previously to the trial, expressed an opinion as to the guilt of the defendant, the affidavit of the defendant is not sufficient, to show that the juror was examined under oath, before he was sworn as a juror, to ascertain whether or not he had formed or expressed such an opinion.

Where it was moved to arrest a judgment in a criminal case, for the reason that the court to which the indictment was presented, was not held at the place fixed by law for holding the same; and where it appeared from the record, that the court-house was in a ruined and dilapidated condition; that the court was first convened at the court-house, and owing to the condition of the same, adjourned to the University building, at which place the court was sitting, when the indictment was presented ; *Held*, That sufficient appeared from the record, to justify the appellate court in assuming that the court-house, owing to its condition, was an improper place for holding court; and that the county court provided for the use of the district court, the University building, or that the same was provided by the sheriff for the use of the court, upon the failure of the county court to provide a place for holding the court.

The appellate court will not presume that the district court undertook to try a defendant, indicted for a criminal offense, without the indictment.

In a criminal case, where there is a general verdict of guilty, on an indict-

ment containing several counts, if any one of them is good, the judg-ment will be supported.

It will be presumed that the district court did its duty, and unless the contrary is made to appear affirmatively, the judgment will not be disturbed.

It is not necessary that it should appear from the records of a cause, that the district court, at each adjournment during the progress of the trial, admonished the jury, that it was their duty not to converse among themselves, on any subject connected with the trial, nor to form or express any opinion thereon, until the cause was finally submitted to them.

*Appeal from the Johnson District Court.*

SATURDAY, JUNE 11.

THE defendant, with fourteen others, was indicted for the murder of Boyd Wilkinson. The indictment contained eight counts, the first of which, after the formal part, read as follows : That Frederick M. Irish, Michael Freeman, Henry Gray, Peter Conboy, Philip Clark, Alfred Curtis, Charles Dow, Samuel Shelledy, Charles Brown, Daniel Marshall, John McGuire, George W. Rawson, James Taylor, Patrick McGraith, and Dennis Hogan, of said county, on the 11th day of May, in the year of our Lord, one thousand and eight hundred and fifty-eight, at Iowa city township, in the said county of Johnson, state of Iowa, in and upon one Boyd Wilkinson, then and there being, feloniously, wilfully, deliberately, premeditatedly, and of their malice aforethought, did make an assault; and that the said Frederick M. Irish, Michael Freeman, Henry Gray, Peter Conboy, Philip Clark, Alfred Curtis, Charles Dow, Samuel Shelledy, Charles Brown, Daniel Marshall, John McGuire, George W. Rawson, James Taylor, Patrick McGraith, and Dennis Hogan, then and there feloniously, wilfully, deliberately, premeditatedly, and of their malice aforethought, did take him, the said Boyd Wilkinson, into the hands of them, the said Frederick M. Irish, Michael Freeman, Henry Gray, Peter Conboy, Philip Clark, Alfred Curtis, Charles Dow, Samuel Shelledy, Charles Brown, Daniel Marshall,

John McGuire, George W. Rawson, James Taylor, Patrick McGraith, and Dennis Hogan, and did then and there, feloniously, wilfully, deliberately, premeditatedly, and of their malice aforethought, fix, tie, and fasten a certain rope about the arms and body of him, the said Boyd Wilkinson ; and then and there, feloniously, wilfully, deliberately, premeditatedly, and of their malice aforethought, they, the said Frederick M. Irish, Michael Freeman, Henry Gray, Peter Conboy, Philip Clark, Alfred Curtis, Charles Dow, Samuel Shelledy, Charles Brown, Daniel Marshall, John McGuire, George W. Rawson, James Taylor, Patrick McGraith, and Dennis Hogan, by means of their threats, menaces, force, and violence, him, the said Boyd Wilkinson, did cause and compel to jump, leap, and plunge, into a certain river there situate, wherein there was a great quantity of water, he, the said Boyd Wilkinson, then and there being so fixed, tied, and fastened, about the arms and body, with a rope as aforesaid, by means of which fixing, tieing, and fastening, and by means of said jumping, leaping, and plunging, of the said Boyd Wilkinson, into the river aforesaid, with the water aforesaid, done and caused by the said Frederick M. Irish, Michael Freeman, Henry Gray, Peter Conboy, Philip Clark, Alfred Curtis, Charles Dow, Samuel Shelledy, Charles Brown, Daniel Marshall, John McGuire, George W. Rawson, James Taylor, Patrick McGraith, and Dennis Hogan, in manner and form aforesaid, he, the said Boyd Wilkinson, in the river aforesaid, with the water aforesaid, was then and there choked, suffocated, and drowned, of which choking, suffocation, and drowning, he, the said Boyd Wilkinson, then and there instantly died.   And so the jurors aforesaid, upon their oaths aforesaid, do say that the said Frederick M. Irish, Michael Freeman, Henry Gray, Peter Conboy, Philip Clark, Alfred Curtis, Charles Dow, Samuel Shelledy, Charles Brown, Daniel Marshall, John McGuire, George W. Rawson, James Taylor, Patrick McGraith, and Dennis Hogan, in manner and form as aforesaid, him, the said Boyd Wilkinson, on the said eleventh day of May, A.

D. 1858, at the county aforesaid, feloniously, wilfully, deliberately, premeditatedly, and of their malice aforethought, did kill and murder, contrary to the form of the statute, in such case made and provided, and against the peace and dignity of the state of Iowa.

The defendant pleaded not guilty, and was tried separately. During the impanneling of the jury, one John Reynolds was called as a juror, and being interrogated under oath, stated that he thought he had formed or expressed an unqualified opinion, or belief, as to the guilt or innocence of the defendant. He was thereupon challenged by the state, and excluded from the jury by the court. The defendant asked the court to allow him to cross-examine the said Reynolds, for the purpose of disproving the said challenge, and showing the competency of the juror, to which the state objected, and the court sustained the objection, and refused to allow the juror to be recalled for the purpose of cross-examination. One David Bortz was also called as a juror, who stated that he had formed or expressed an unqualified opinion, or belief, that the defendant was guilty or not guilty of the offense charged in the indictment. He was then challenged by the state, and the court sustained the challenge. Before the said juror left the box, the defendant asked the said juror, whether the unqualified opinion or belief that he had formed, or expressed, was favorable, or unfavorable, to the state? And thereupon the court interfered, and refused to allow the said question to be asked, and directed the said Bortz not to answer the same.

After the state and the defendant had each challenged one juror peremptorily, the state moved the court to require the defendant to challenge peremptorily another juror, before the state should be required to exercise its second peremptory challenge, and that in case the defendant failed or refused to make such challenge, he should be deemed to waive the same, which motion was sustained by the court; and the said defendant, throughout the impanneling of the said jury, was required to exercise two peremptory chal-

The State of Iowa v. Shelledy.

lenges together, or waive the same.  After the defendant had challenged four, and the state three jurors, peremptorily, one Lorenzo Davis was called as a juror, who was challenged peremptorily by the defendant.  The court then required the defendant to make his sixth peremptory challenge, or he would be deemed to have waived the same. The defendant thereupon asked the court to have the panel filled, before he should be required to exercise the right of making his sixth peremptory challenge, which request was objected to by the state, and sustained by the court.  After the state had challenged six jurors peremptorily, and had exhausted its right of challenge, and after the defendant had peremptorily challenged nine jurors, and had waived his tenth challenge, the panel was again filled, and thereupon the defendant peremptorily challenged one William Davis. The defendant then asked the court to fill the vacancy in the jury, caused by the challenge of the said Davis, before he should be required to make his final peremptory challenge, which request being objected to by the state, the court refused to cause the panel to be filled, and decided that the defendant should make his last peremptory challenge from the eleven jurors then in the box, or be held to have waived the same.  To all these rulings of the court, in relation to impanneling the jury, the defendant at the time excepted.

Upon the conclusion of the testimony, the court, upon its own motion, among other things, charged the jury as follows :

" If two or more persons conspire together to do an unlawful act, and in the prosecution of the design, an individual is killed, or death ensue, it is murder in all who enter into, or take part in the execution of the design.   But if the unlawful act be a trespass only, to make all guilty of murder, the death must happen in the prosecution of the design. If the unlawful act be a felony, or be more than a mere trespass, it will be murder in all, although death happen collaterally, or beside the original design."

"Manslaughter is the unlawful and felonious killing of another, without malice, either express or implied. It differs from murder in this: that though the act which occasions the death be unlawful, or likely to be attended with bodily mischief, yet malice, either express or implied, which is the very essence of murder, is presumed to be wanting; and if, therefore, in doing an unlawful act, or in carrying out an unlawful design, death happen, but without malice, the offence would be only manslaughter, provided such unlawful act or design be not a felony; because, then, the law implies the existence of malice. But if the intent goes no further than to commit a bare trespass, it will be manslaughter."

At the request of the state, the court further instructed the jury as follows:

1. That in order to constitute murder in the first degree, under the laws of this state, a design must be formed to kill *wilfully*—that is, of purpose; *deliberately*—that is, with cool purpose; *maliciously* — that is, with malice aforethought; and *premeditatedly*—that is, the design must be formed before the act by which death is produced occurs, or else the death must have occurred in the perpetration, or attempt to perpetrate, the crime of arson, robbery, mayhem or burglary.

2. That in order to constitute a premeditated and deliberate homicide, (which is murder in the first degree,) it is not necessary that the design to kill should have existed for any definite or certain space of time; but if the preconceived intention, and cool, deliberate purpose to kill, exist at the moment of the commission of the act, it is all that the law requires.

3. That the term "malice aforethought," as used in our statute, in the definition of the crime of murder, is not to be understood merely in the sense of a feeling of malevolence to a particular person, but as meaning that the offense or killing has been attended with such circumstances as are the ordinary symptoms of a wicked, depraved and malig-

nant spirit—a heart regardless of social duty, and deliberately bent upon mischief. And hence, in general, any formed design of doing mischief, which may result in death, may be called malice; and therefore, not such killing only as proceeds from premeditated hatred or revenge against the person killed, but also such killing as is accompanied with circumstances that show the heart to be perversely wicked, is adjudged to be "malice aforethought."

4.  That malice, or "malice aforethought," (in the language of our statute,) may be express or implied. Express malice is, where one person kills another, with a sedate, deliberate mind and formed design, such formed design being evidenced by external circumstances, discovering the inward intention and premeditation, such as lying in wait, antecedent menaces, former grudges, and concerted schemes to do the party some bodily harm. Implied malice is, where the killing is effected by any deliberate, premeditated, cruel act, evincing a design to take human life, and done without present provocation.

5.  That where two or more persons conspire to do, and are associated for the purpose of doing, an unlawful act, the act or declaration of one of such persons, while engaged in, and in pursuance of the common object, is the act and declaration of all, for which all are liable, as each person so associated is deemed or presumed to have assented to, or to command, what is done by any other of the conspirators, in furtherance of the common object.

6.  That the intention of the defendant, and whether there was a premeditated design to kill, at or before the time of the death of Wilkinson, may be gathered from the acts and declarations of the defendant, and other persons associated with him, while engaged in the commission of the alleged unlawful act, or while they were preparing to commit the same; and the jury, in arriving at such intention, and in determining whether there was a premeditated killing, may look at all the circumstances and facts attending the transaction.

The State of Iowa v. Shelledy.

7.  That where it is sought to reduce the criminal nature of a homicide, from murder in the second degree to manslaughter, by proof of threats on the part of the deceased, it must also be shown, in order to justify the homicide, or mitigate the offense, that such threat came to the knowledge of the party threatened, prior to the commission of the homicide, and that the deceased, at the time of the killing, was in the act of putting said threats into execution, and thereby induced a reasonable belief on the part of the slayer, that his own life was in immediate danger, or that the deceased was about to commit a felony.

8.  That when a premeditated purpose to kill is entertained, and there is a consequent unlawful act of killing, the provocation, whatever it may be, which immediately precedes the act, is to be thrown out of the case, and goes for nothing, unless it can be shown that this purpose was abandoned before the act was done.

9.  That if the jury believe from the evidence, that the defendant, with other persons, went to the house of Boyd Wilkinson, with the premeditated design to take the life of said Wilkinson, either by hanging or otherwise, and that the death of the said Wilkinson was occasioned by the acts of the said defendant, and others, while engaged in carrying out the design which took them to his house, then, and in that case, the threats of the said Wilkinson, or any provocation he may have given said defendant, and others, or either of them, prior to that time, are to be entirely disregarded, and cannot be received to mitigate the offense, or lessen the criminal nature of the act, unless they show that the design to take life, was abandoned before the death of Wilkinson, as there can be no palliation or justification of a premeditated homicide.

10.  That where two or more persons are jointly charged with a criminal offense, and it is sought to palliate or justify the offense, by proof of provocation on the part of the person injured, the provocation, in order to palliate or justi-

fy as to all, must be shown to extend to all; or, in other words, that in a case of homicide, threats made by the deceased against the person or property of one of the defendants, or one of those engaged with them, and which he was not in the act of putting into execution, at the time of the death, will not justify the defendant, and others engaged with him, nor palliate the criminal nature of their act.

11.   That the declarations. of Gray and others, at the meeting at the Mansion House, or after the company left there to carry out the design of the meeting—that Wilkinson had burned the barn of Clark—that he had threatened to burn the property of others—that said Gray had a warrant, and was authorized to serve the same, and arrest Wilkinson, and the declarations of Gray, that he had before been authorized to search the house of said Wilkinson for stolen goods, which he had found there—and other declarations of a similar character—are not to be received as evidence of those facts; but the defendants, in order to establish such facts, must prove the same by competent evidence.

12.   That partial variances in the testimony of different witnesses, on minute and collateral points, are of little importance, unless they be of too prominent and striking a nature, to be ascribed to mere inadvertence, inattention, or defect of memory; that it so rarely happens that witnesses of the same transaction, perfectly and entirely agree on all points connected with it, that an entire and complete co-incidence, in every particular, so far from strengthening their credit, not unfrequently engenders a suspicion of practice and concert; and that in determining upon the credence to be given to testimony, by the jury, the real question must always be, whether the points of variance and of discrepancy, be of so strong and decisive a nature as to render it impossible, or at least difficult, to attribute them to the ordinary sources of such variances, viz: inattention or want of memory.

13.   That when the existence of deliberate malice in the

defendant, and others acting with him, is once ascertained, its continuance down to the perpetration of the meditated act, must be presumed, until there is evidence to repel it, and to show that the wicked purpose was abandoned before the commission of the act.

14.  That it does not follow, merely because a witness makes an untrue statement, that his entire testimony is to be disregarded.  This must depend upon the motive of the witness.  If he intentionally swears falsely as to one matter, the jury may properly reject his whole testimony as unworthy of credit.  But if he makes a false statement through mistake or misapprehension, they ought not to disregard his testimony altogether, and they should not consider the circumstance further, than as showing inaccuracy of memory or judgment, on the part of the witness.

15.  That the declarations of the defendant, and those engaged with him, while engaged in the unlawful act, are to be received as evidence of their motives and intentions, only so far as their acts are consistent with those declarations; or, in other words, that where the acts of a person are inconsistent with his declarations, the former are better evidence of his intentions than the latter.

16.  That if the jury believe that the defendant and others, combined for the purpose of lynching Wilkinson, (the deceased), that they took and bound him, and that in carrying out said intention, the death of Wilkinson occurred, by the acts of the defendants, all who entered into the said combination, or in any way aided or abetted the common design, are guilty of murder in the second degree, whether present or not.

17.  The jury, if they are satisfied of the homicide, in determining the degree of the crime committed in causing the death, cannot consider any provocation, on the part of the deceased, for the purpose of reducing it from murder to manslaughter—unless said provocation was so recent, that the homicide was committed in a sudden transport of pas-

sion, occasioned by that provocation—that is, that if between the provocation and the homicide, there was sufficient time for the blood to cool, passion to subside, and reason to interpose—the provocation, however great, amounts to nought, and cannot be considered by the jury.

18. That in determining the time for the passion to cool, the inquiry is, whether the suspension of reason, arising from sudden passion, continued from the time of provocation, till the very instant the act producing death took place; and that if, from any circumstance whatever, it appears that the parties reflected or deliberated, or if, in legal presumption, there was time or opportunity for cooling—that then the provocation cannot be considered by the jury in making up their verdict.

19. That if the jury believe from the evidence, that the said Wilkinson, was not thrown or pushed into the river by the said defendant, and others then engaged with him, but that he jumped into the said river himself, either to escape the threatened violence of said defendant, and others engaged with him, or from a reasonable and well grounded apprehension that his life was in danger, and with the hope to save his life; and if the jury further believe, from the evidence, that the said defendant, and others then engaged with him, or any of them, after said Wilkinson was in said river, stood by, and made no effort to save him from drowning, the fact that the said defendant, and others then engaged with him, or some of them, so stood by, and made no effort to rescue the said Wilkinson from drowning, is a circumstance which the jury may take into consideration, in arriving at the intention and purpose with which the party went to the house of, and arrested the said Wilkinson.

20. That every man is presumed to intend the necessary consequence of his own acts; and that it is a maxim of the law, that a presumption shall stand until the contrary is proved.

21. That under our statute, when a homicide is proved, the presumption is, that it is murder in the second degree;

and if the prosecution would make it murder in the first degree, they must establish the characteristics of that crime, as contemplated by our statute, which provides, that "all murder which is perpetrated by means of poison, or lying in wait, or any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration, or attempt to perpetrate, any arson, rape, robbery, mayhem, or burglary, is murder of the first degree;" and if the defendant would reduce it to manslaughter, the burden of proof is on him.

22.   That where two or more persons combine to do an unlawful act, and death happen to another party in the prosecution of the unlawful act designed, it is murder in all who thus conspire, whether they were present at the time of the death or not.   If the unlawful act, contemplated or designed, was to take the life of a human being, or to commit arson, burglary, mayhem, or robbery, it is murder in in the first degree.   If the design or intention was to commit any other unlawful act, it is murder in the second degree, or manslaughter, according to the circumstances.

23.   That if the jury believe from the evidence, that the defendant, and others, formed the design of taking the life of the said Wilkinson, whether by hanging or otherwise; that in pursuance of such design, the defendant and others went in a body to the house of said Wilkinson, armed, and resolved, and prepared to resist all opposition; that they obtained possession, by force, or otherwise, of the body of said Wilkinson, and bound the arms of the said Wilkinson, so as to render him helpless; that after they had so obtained possession of the said Wilkinson, the said defendant, and those then engaged with him, or any of them, in the presence and hearing of the said Wilkinson, avowed their purpose to take the life of the said Wilkinson, by hanging or otherwise; that they forced the said Wilkinson into a hack, while thus bound, and started to the timber with him; that while on the road to the timber, and when on the bank of

the Iowa river, they cast the said Wilkinson, while thus bound, into said river, from said hack, or compelled the said Wilkinson, by threats or otherwise, to jump from said hack into said river, and they then and there permitted him to drown, while standing by, and made no effort to rescue the said Wilkinson, if by reasonable efforts they might have done so, then the said defendant is guilty of murder in the first degree.

24. That if the jury believe from the evidence, that the defendant, and other persons, formed the design of committing personal violence on the body of the said Wilkinson, as by lynching, or otherwise, but did not design to take his life; that in pursuance of such design, they went in a body to the house of the said Wilkinson, armed, and resolved and prepared, to resist all opposition; that they obtained possession of the body of the said Wilkinson, and bound his arms, so as to render the said Wilkinson helpless; that they forced the said Wilkinson into a hack, while thus bound, and started to the timber with him; that before and after they thus started, one or more of those thus engaged, in the presence of Wilkinson, declared that he should be hung, or that he should die before sundown, or otherwise threatened the life of the said Wilkinson; that while on the road to the timber, and when on the bank of the Iowa river, the said Wilkinson, while thus bound, and in the custody of the said defendant, and others then engaged with him, entertained a reasonable and well grounded apprehension—an apprehension justified by the circumstances—that the said defendant, and others then engaged with him, intended to commit personal violence on the said Wilkinson, or to take the life of the said Wilkinson, and under that apprehension sprang from the carriage into the said river, hoping thereby to escape the threatened violence or apprehended death, and was then and there drowned—the said defendant, and others then engaged with him, standing by, and neither rescuing nor offering to rescue the said Wilkinson—then the said defendant is guilty of murder in the second degree.

25. That while private persons may arrest another, where a public offense is committed, or attempted, in their presence, or when a felony has been committed, and they have reasonable cause for believing the person arrested, to have committed it; yet in such a case, the persons making the arrest, must confine themselves within the strict limits of the law, and if they exceed those limits, the person, or persons, making the arrest, become trespassers *ab initio*—all their acts are void—and they are liable for the consequences; and if the jury believe from the evidence, that the defendant, and others then engaged with him, went to the house of Wilkinson, knowing that a felony had been committed, and having reasonable cause to believe that Wilkinson committed it, for the purpose of arresting the said Wilkinson; that before, or at the time of arresting the said Wilkinson, they determined to make him confess the commission of the alleged felony, by the use of personal violence; that in pursuance of this determination, they bound his arms, forced him into a hack, and started with him to the timber; that while on the road to the timber, the said Wilkinson, from a reasonable apprehension that his life was in danger, or in the hope of escaping from the threatened punishment, jumped from the said hack, thus bound, into the Iowa river, and was drowned, that then, and in that case, the said defendant, and those then acting with him, are trespassers from the beginning—the original arrest became unlawful—and the defendant is guilty of murder in the second degree.

26. That if the jury believe from the evidence, that the defendant, and others, conspired to take the life of the said Wilkinson, whether by hanging, or otherwise; that with such premeditated design, they went to said Wilkinson's, and took him into their custody; that they then bound his arms so as to render him helpless, forced him into a hack, and started with him to the timber on the Iowa river, with the avowed design of hanging him; that while in their custody, and

thus bound, and when on the bank of said river, the said Wilkinson, from a well-founded apprehension that his life was in danger—either hoping to escape, or from a choice as to the manner of his death—jumped from said hack into said river, and was drowned; and that the said defendant and others engaged with him, stood by, and permitted him to drown, making no effort to rescue said Wilkinson, then, and in that case, the fact that the said defendants, and others engaged with him, designed to take the life of the said Wilkinson, by hanging, or otherwise, and not by drowning, is utterly immaterial, and cannot reduce the criminal nature of the act to murder in the second degree.

27. That if the jury believe from the evidence, that defendant, with others, was at the meeting at the Mansion House, and aided in the election of officers, or assented to their election; and that they afterwards formed into line at the Clark place, or otherwise put themselves under the command of Captain Gray, and other officers, with the intention to resist all opposition, and carry out or execute the orders of their leaders or officers; that said leaders intended to take Wilkinson out and lynch him; and that said Wilkinson lost his life in the prosecution of that design—then, and in that case, unless they abandoned the enterprise before its completion, there was such a combination or con_spiracy, as makes the acts and declarations of one, the acts and declarations of all who so combined; and that they are each and all guilty of murder in the second degree, whether present at the death or not.

28. That if the whole evidence, taken together, produced such a conviction on the mind of the jury, of the guilt of the prisoner, as they would act upon in a matter of the highest importance to themselves, in a like case, it is their duty to convict.

29. In general, where an involuntary killing happens in consequence of an unlawful act, it will be either murder or manslaughter, according to the nature of the act which

occasions it. If it be in the prosecution of a felonious intent, or in consequence of an act naturally tending to bloodshed, it will be murder. If no more was intended than a mere civil trespass, it is manslaughter.

30. That if the jury believe the defendant and others, took Boyd Wilkinson, and bound him, and put him into a hack, or, in other words, took him bound into their possession, it was incumbent upon them to return him safely to his family; and that it is not necessary that the fatal result should have sprung from an act of commission, for if defendant omitted an act incumbent on him, from which death resulted to deceased, he is guilty of manslaughter, if there was no malice; if there was malice, it is murder.

To the giving of all these instructions, the defendant excepted. The court also, at the instance of the defendant, instructed the jury as follows:

3. That murder, either in the first or second degree, cannot be committed, without proof of malice on the part of those committing it, and that such malice existed at the time the killing was done.

4. Where a witness is contradicted in any material statement sworn to by him, by other witnesses on the trial, such as that the witness had heard threatening language used by any of the defendants, when others were equally present and in hearing, who swear that no such threat was made; that he knew nothing of a meeting of defendants at the Mansion House, when he had previously mentioned it to another witness, and manifested a desire or haste to be present at such meeting; that one of the alleged conspirators was on the ground, and giving directions for the formation of the company, when, in fact, such person was not present for a long time thereafter; that he had not said he had gone to inform a third person of what was going on by the company, when, in fact, he had so said; that he had not expressed an approbation of the proceedings of the defendants, or that the interests of community required that the deceased should be read out of the place, when, in fact, the

witness had repeatedly expressed and declared both, in the presence of different witnesses; these things, or either of them, or any other like contradictions, are legal evidence tending to discredit the entire testimony of the witness, both by way of impeachment, and also as going to show complicity in the pretended conspiracy; but the jury are to determine whether there are any such contradictions, and also who of the contradicting witnesses, are most worthy of belief.

6.   A person is not required, by law, to put his own life in peril to save the life of another.

9.   That if the jumping from the hack into the river, by Wilkinson, was his own voluntary act, and not the result of any act or force of the defendants, the jury should find the defendant not guilty; and that such act or force cannot be presumed against the defendant, but must first be clearly proved by the state, before the defendant can be found guilty under this indictment. And, further, if the evidence leaves so much as one rational doubt in the minds of the jury, as to whether the defendant forced the deceased to jump in, they are bound by law to return a verdict of not guilty—the state being first bound, before a conviction can be had, to prove such act or force, used by the defendants, and what it was.

10.   With respect to all verbal admissions, declaration, or conversations, evidence of them should always be received with great caution. Consisting, as it does, in the repetition of oral statements, it is subject to much imperfection and mistake; the party himself being misinformed, or not having expressed his own meaning, or the witness having misunderstood him, or from the infirmity of human memory. It frequently happens, also, that the witness, unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say. And, especially, where the witness has not heard all the admissions, declarations, or conversation, and testifies only to parts thereof, should cau-

tion be exercised. It then becomes very unsatisfactory and imperfect evidence—the lowest grade of evidence.

11. In civil cases, where the mischief of an erroneous conclusion is not deemed remediless, it is not necessary that the minds of the jurors be freed from all doubt; it is their duty to decide in favor of the party on whose side the evidence preponderates, and according to the reasonable probability of truth. But in criminal cases, because of the more serious nature of the consequences of a wrong decision, the jurors are required to be satisfied beyond any reasonable doubt, or it is their duty to acquit—the charge not being proved by that higher degree of evidence which the law demands. In civil cases, it is sufficient if the evidence on the whole, agrees with and supports the hypothesis, which it is adduced to prove; but in criminal cases, it must exclude every other hypothesis but that of the guilt of the party. The law presumes the defendant innocent of the offense charged against him in the indictment, and this presumption remains in force, and the jury is bound to act on it, until the state proves his guilt beyond any reasonable doubt.

12. No presumption arises against the defendant, from the proof that a homicide, or the killing of a human being, has been perpetrated, until the state has first proved beyond a reasonable doubt, that the defendant is guilty of the killing, in the manner, and at the place charged; and this law is as applicable to the crime of manslaughter, as to murder in either degree.

13. That the defendant is entitled to every reasonable doubt, and " that neither a mere preponderance of evidence, nor any weight of preponderant evidence, is sufficient for the purpose of conviction, unless it generate full belief of every material allegation in the indictment, to the exclusion of all reasonable doubt, for it is not enough that the evidence goes to show the guilt of the defendant. It (the evidence), must be inconsistent, with any reasonable supposi-

tion of his innocence," or the jury will find the defendant not guilty.

14.   The jury must be satisfied beyond any reasonable doubt, that the death of Wilkinson, was either the necessary, or the usual, probable, or natural result of the acts of the defendant, specified in the indictment, and not of his own act, or they must find the defendant not guilty.

15.   If the jury believe from the evidence, that Wilkinson voluntarily jumped into the river, and drowned himself, it will be their duty to find the defendant not guilty.

16.   A man may jump, or throw himself into a river, under such circumstances as to render it not a voluntary act, by reason of force applied either to the body or mind.   It becomes, then, the guilty act of those who compelled the deceased to take the step; but to arrive at the conclusion that Wilkinson, the deceased, was compelled, by the force applied to his mind by the defendant, to jump into the river, so as to make the defendant guilty of murder, the jury must be satisfied, beyond any reasonable doubt, of the four following propositions, to-wit:   1.   That Wilkinson, the deceased, apprehended immediate violence.   2.   That such apprehension on the part of the deceased, was well grounded, from the circumstances by which he was surrounded.   3.   That the step was taken by Wilkinson, and that he jumped into the river, with a view to make his escape, and not put an end to his life.   4.   That the step thus taken, and the jumping into the river by deceased, with a view to escape, was such a step as a reasonable man would take to effect his escape.   And if the jury entertain a reasonable doubt of any one or more of these four propositions, although they are fully satisfied of the truth of the other three, it will be their duty to find the defendants not guilty.

The following instructions, asked by the defendant, were refused by the court:

1.   A conspiracy to do the act complained of, (in this case murder,) must first be proved to have been the original object and design of the co-conspirators, before they can

jointly be held responsible for the acts or declarations of any one individual of their number, looking to the consummation of the original object or design.

2.   The leading object of the jury in this case, should be to ascertain the original and real motive and design of the defendant, and those associated with him, in the arrest of Boyd Wilkinson. Upon this point the open publicity of the meetings—their being all held, and the acts charged, performed in open daylight, without remonstrance or opposition from the public, furnish proper evidence for the consideration of the jury in determining upon their true motives and designs.   The declarations made at the meeting, such as, " that their motive was to arrest him, and bring him to justice; that it was for the purpose of protecting the life and property of Philip Clark, and other citizens, who had been unjustly deprived and robbed of their property, and beaten and threatened with death; and that not a hair of his head was to be hurt—are all legal evidence tending to show the real design and motives.

4.   It is not necessary for the defendant to prove from the records of the county, or in any other way, that Philip Clark had actually been driven from and robbed of his property; that the deceased had made threats both against his property and his life, and for such threats had been required to furnish surety of the peace, or be committed, and was, notwithstanding, still suffered by the officers to run at large, and repeat and execute his threats, if the jury are satisfied from the testimony of Henry Felkner, J. D. Tevis, and others, who attended both meetings, that the persons charged with unlawful conspiracy, really acted in good faith at their meetings, under the belief that such were the facts.

The jury returned a verdict of guilty of murder in the second degree, and thereupon the defendant filed a motion to set aside the verdict, and for a new trial, setting out eighteen grounds for the motion, among which are the following:

11.   The court permitted the jury to separate after they

had been sworn, and after part of the evidence had been given, and before they rendered their verdict.

12. The defendant was not present in court during the whole of the trial, but was absent a part of the time while the court was instructing the jury, and when the jury retired to consider of their verdict.

13. The court misdirected the jury—giving instructions which should not have been given, and refusing those which should have been given.

14. Because Daniel A. Shafer, one of the jurors, had prejudged the defendant's case, and expressed an unqualified opinion and belief, before the trial, that the defendant was guilty.

The fourteenth ground of the motion, was supported by the affidavits of three persons, who deposed to having heard the said Shafer, before the trial, express his opinion that the defendant was guilty, and ought to be punished, and also by the affidavit of the defendant himself, who stated that until after the trial, he had no knowledge that the said Shafer, previously to the trial, had expressed an opinion adverse to the defendant, and that the said juror on his examination under oath, before he was sworn as a juror, stated that he had not either formed or expressed an opinion, as to the guilt or innocence of the defendant. The juror, Shafer, also filed his affidavit, denying that he had ever used the language imputed to him, or that previous to the trial, he had formed or expressed any opinion on the subject.

The motion to set aside the verdict having been overruled, the defendant then filed a motion in arrest of judgment, assigning as reasons therefor, the following:

1. Because the court to which said indictment was presented, was not held at the place fixed by law for holding the same.

2. Because the indictment is not sufficient to warrant any judgment against the said defendant.

3. Because the court had no jurisdiction to try the de-

fendant on the indictment at the time of the trial—a change of venue having been applied for by F. M. Irish, one of the defendants, which was allowed by the court, and the venue changed to Scott county, in the Seventh Judicial District, before the trial of said Shelledy had commenced.

4.   Because the second count in said indictment, is entirely insufficient to warrant a judgment against the defendant.

5.   Because there is a material variance between the evidence as to the manner and means of killing, and all the counts in said indictment, except the second, in which said second count no manner or means of killing is alleged.

The motion in arrest of judgment was overruled, and the defendant sentenced to ten years imprisonment in the penitentiary, at hard labor, and to pay the costs of prosecution—from which judgment he appeals. The errors assigned, and other material facts, sufficiently appear from the opinion of the court.

*William Smyth* and *Joseph Knox*, for the appellant, in support of the errors assigned, cited *The State* v. *Burton*, 2 Dev. & Bat., 196; *ex parte Vermilyea*, 6 Cow., 555; 7 Ib., 108; *The People* v. *Mather*, 4 Wend., 229; *Mann* v. *Glover*, 2 G. Greene, 195; *Irvine* v. *Kean*, 14 S. & Rawle, 292; *The Com.* v. *Lesher*, 17 Ib., 155; *Freeman* v. *The People*, 4 Denio, 1; *The People* v. *Bodine*, 1 Ib., 281; 2 Gra. & W. on New Trials, 283, note; 1 Stark. Ev., 184; Code, sec. 2988; *The State* v. *Pierce, ante* 231; 1 Chitty Cr. Law, 544; 2 Gra. & W. on New Trials, 472; *The People* v. *Rector*, 19 Wend., 576; 1 Greenl. Ev., 449; 1 Russ. on Crimes, 24; Whart. Am. Law of Homicide, 345; *Regina* v. *Barrett*, 2 Eng. Com. Law, 343; *Regina* v. *Hames*, 2 Ib., 368; *The State* v. *Smith*, 32 Maine, 369; 1 Gallison C. C., 628; *Rex* v. *Rawlins*, 7 C. & P., 153; *Jones* v. *The State*, 3 Blackf., 475; 8 Johns., 437; 11 Ib., 442; *VanDoren* v. *Walker*, 2 Caines, 373.

The State of Iowa v. Shelledy.

*S. A. Rice*, (Attorney General), for the state, cited Code, secs. 2982, 2986 ; 13 State Trials, 334 ; *King* v. *Edmonds*, 6 Eng. Com. Law, 502 ; 1 Chitty Cr. Law, 547 ; *The People* v. *Rector*, 19 Wend., 569 ; *The State* v. *Pierce*, ante 231 ; 4 Block. Com., 353 ; *The State* v. *Benton*, 2 Dev. & Bat., 490 ; 1 Chitty Cr. Law, 539 ; 1 Archb., 163 ; *Com.* v. *Rogers*, 7 Metc., 500 ; *The State* v. *Potter*, 18 Conn., 175 ; *The State* v. *Cokely*, 4 Iowa, 477 ; Code, sec. 2399 ; 1 Greenl. Ev., 445 ; *The U. S.* v. *Ross*, 1 Gallison, 629 ; 2 Bishop Cr. Law, sec. 626 ; *Carroll* v. *The State*, 23 Ala., 28 ; 1 Bishop Cr. Law, sec. 254 ; Arch. Cr. Pl., 9 ; *Com.* v. *Dana*, 2 Metc., 329 ; *Beets* v. *The State*, Meigs, 106 ; *Brennan* v. *The People*, 15 Ill., 511 ; Wharton, 261 ; 1 Russ. on Crimes, 30 ; *Gover* v. *Dill*, 3 Iowa, 342 ; 3 Greenl. Ev., 14 ; 9 Metc., 103 ; *Com.* v. *Webster*, 5 Cush., 305 ; 1 Greenl. Ev., sec. 34 ; *Regina* v. *Pitts*, 1 C. & M., 159 ; *The U. S.* v. *Fermoss*, 4 Mason, 505 ; 1 Bishop Cr. Law, sec. 230 ; *Amor* v. *The State*, 11 Humph., 159 ; *The U. S.* v. *Warner*, 4 McLean, 478 ; *Regina* v. *Haines*, 2 C. & K., 371 ; *Taylor* v. *Greeley*, 3 Greenl., 204 ; 2 Maine, 198 ; 3 Jones (N. C.) 443 ; *Castles* v. *The State*, 19 Geo., 628 ; 1 Johns., 320 ; 1 Blackf., 319 ; 7 How., 420 ; 8 Greenl., 113 ; 3 Hill, 194 ; *Garder* v. *Pickett*, 19 Wend., 186 ; 3 Gra. & W. on New Trials, 793 ; 3 Johns., 528 ; *Kelley* v. *Varney*, 2 Frost, 99.

STOCKTON, J.*—The statute provides that a challenge for cause, may be taken either by the state or by the defendant; and if for implied bias, may be for the reason, that the juror has formed or expressed an unqualified opinion or belief, that the prisoner is guilty or not guilty of the offense chharged. Code, secs. 2982, 2986.

It was sufficient cause of challenge to the juror, Reynolds, in this instance, that on his examination as a witness, to

---

*WRIGHT, C. J., dissented upon the points indicated in the opinion, but wrote no dissenting opinion.

prove the challenge as to him on the part of the state, he testified that "he thought he had formed or expressed an unqualified opinion or belief, that the defendant was guilty or not guilty of the offense charged." It need not appear that the opinion or belief, formed or expressed by the juror, was in favor of the prisoner, to constitute the same good cause of challenge. It is sufficient if the opinion is formed or expressed either for or against him. If in his favor, it is not claimed but that the challenge was properly allowed; if against him, the defendant has no cause of complaint, that a juror who has formed or expressed the opinion that he is guilty of the offense charged against him, has been challenged for that cause by the opposite party.

The proof in support of the challenge having been heard by the court, the defendant objected to the sufficiency of the challenge, and to the sufficiency of the proof to support the same. The court overruled the objection, and allowed the challenge; and after the juror had left the jury-box, the defendant asked to be allowed to cross-examine him, and to have the juror recalled for the purpose of disproving the challenge, and to show his competency as a juror. This being objected to by the state, the court refused to the defendant the privilege of recalling the juror, for the purpose of such cross-examination. The question as to the propriety of recalling the juror, was within the discretion of the district court; and that discretion will not be controlled, unless it is shown to have been greatly abused. *The People* v. *Rector*, 19 Wend., 576; *Law* v. *Merrills*, 6 Ib., 280.

The juror, Bortz, was challenged by the state, for particular cause, on the gruond of implied bias, and being sworn as a witness, for the purpose of proving the challenge, declared that he had formed or expressed an unqualified opinion or belief, that the defendant was guilty or not guilty of the offense charged. The counsel for the defendant then asked the said juror, "whether the unqualified opinion or belief that he had formed or expressed, was favorable or un-

favorable to the state." The court refused to permit the juror to answer the question, and decided that the testimony was sufficient to sustain the challenge, and allowed the same. We think there was no error in this ruling of the court. It was sufficient cause of challenge, that the juror had formed an unqualified opinion, and no useful purpose was to be obtained by allowing him to state whether the opinion was favorable or unfavorable to the state.

The defendant moved the court, that before he should be required to make his sixth peremptory challenge, the panel of jurors might be filled. Objection being made by the state, the court sustained the objection, and refused to order the panel to be filled; and there being but eleven jurors in the box, the defendant was required to exercise his right of making his sixth peremptory challenge, or waive the same. And after the district attorney had exhausted the peremptory challenges allowed to the state, the defendant challenged peremptorily one Davis, who was excluded from the jury-box, and thereupon moved the court to fill the vacancy in the panel of the jury, before he, (the defendant), should make the last peremptory challenge remaining to to him. Objection being made, the court decided that the defendant should make his last peremptory challenge from the eleven jurors then in the jury-box, or in case of failure to do so, he should be deemed to have waived the same.

The statute has provided, in civil causes, that " after each challenge, the vacancy shall, if required, be filled before farther challenges are made." Code, sec. 1775. There is no such provision, however, applicable to criminal causes; and it is the opinion of a majority of the court, that in the absence of any statutory direction, the mode of proceeding is left to the discretion of the district court; and unless there has been a gross abuse of this discretion, there is no call for the interference of the court. *State* v. *Potter*, 18 Conn., 175. (WRIGHT, C. J., *dissenting*).

In the absence of any rule of law on the subject, the ma-

jority are of opinion that the court, it is to presumed, has adopted a rule of its own, and that the same has been followed in impanneling the jury. And where this has been done, no such prejudice has resulted to the defendant, as to require a reversal of the judgment, unless the discretion of the court in the premises is shown to have been greatly abused. (WRIGHT, C. J., *dissenting*.)

Exception was taken to the instructions given to the jury at the request of the state, and also to those given by the court, on its own motion, and to the refusal of the court to give certain instructions asked by defendant. The jury were directed, that "if two or more persons conspire together to do an unlawful act, and in the prosecution of the design, an individual is killed, or death ensue, it is murder in all who enter into, or take part in, the execution of the design. If the unlawful act be a trespass only, to make all guilty of murder, the death must ensue in the prosecution of the design. If the unlawful act be a felony, or be more than a mere trespass, it will be murder in all, although the death happened collaterally, or beside the original design." There was no error in this direction of the court. Foster, 258, 344, 351; 1 East. P. C., 255, 259; 1 Hale P. C., 443, 444; *U. S.* v. *Ross*, 1 Gallison, 626; 2 Bishop Cr. Law, 626.

The direction of the court to the jury, as to what constituted manslaughter, was as favorable to the defendant as he could, in reason, require to be given. The common law definition of manslaughter has not been changed by our statute, and if the court erred, it was error on the side of the prisoner, in charging the jury, that in the commission of an unlawful act, or in carrying out an unlawful design, if the intent go no further than the commission of a bare trespass, and death ensues, it will only be manslaughter. 2 Bishop Cr. Law, sec. 624, 627; *The People* v. *Enoch*, 13 Wend., 163; *The People* v. *Rector*, 19 Ib., 592.

The fifteenth instruction given at the request of the state,

VOL. VIII.—64

was as follows : " That the declarations of the defendant, and those engaged with him in the unlawful act, are to be received as evidence of their motives and intentions, only so far as their acts are consistent with those declarations; or, in other words, where the acts of a person are inconsistent with his declarations, the former are better evidence of his intentions than the latter." This is but a statement, in another form, of the rule laid down by the elementary law writers, that every person is presumed to contemplate the ordinary and natural consequences of his own acts. 1 Greenl. Ev., sec. 14. Declarations made at the time of the transaction, expressive of its character, motive or object, are regarded as verbal acts, indicating a present purpose and intention, and are, therefore, admitted in proof, like other material facts; they are parts of the *res gestæ.* Ibid, sec. 108. But where the declaration and the act are inconsistent, if the act goes beyond the declaration, or contradicts it, the presumption of intention is to be gathered from the act, upon the plain and obvious principle, that the party must be presumed to intend to do that which he voluntarily and wilfully does in fact do—his acts speak louder than his words.

The court, in the twenty-third instruction, directed the jury, that if the defendant, and others, formed the design of taking the life of Wilkinson, by hanging or otherwise, and in pursuance of such design, armed, and resolved and prepared to resist all opposition, obtained possession of his body, and bound him, so as to render him helpless, and avowed their purpose to take his life, by hanging or otherwise; that they forced him, thus bound, into a carriage, and started with him to the woods, and that while on the road, and near the river, they either cast him into the river, thus bound, or compelled him, by threats or otherwise, to jump from the carriage into the river, and permitted him to be drowned, they standing by and making no effort to rescue him, if by reasonable effort they might have done so, then the defendant was guilty of murder in the first degree. And

in the twenty-fourth instruction, that if, with the design of committing personal violence upon the body of Wilkinson, but without design to take his life, they started with him, bound as aforesaid, to the woods, declaring that he should be hung, or otherwise threatening his life, and Wilkinson, from a reasonable and well grouned apprehension of violence, or loss of life, hoping to escape the threatened violence, or apprehended death, jumped from the carriage into the river, and was drowned, the defendant, and those engaged with him, standing by, and neither rescuing or offering to rescue Wilkinson, that then defendant was guilty of murder in the second degree.

This instruction is sustained by authority. In *Regina* v. *Pitts*, 1 Carr. & Mar., 284, (41 Eng. Com. Law), the jury were directed, that "a man may throw himself into a river, under such circumstances as render it not a voluntary act, by reason of force applied either to the body or the mind. It then becomes the guilty act of him who compelled the deceased to take the step. But the apprehension must be of immediate violence, and well grounded from the circumstances by which the deceased is surrounded; not that the jury must be satisfied that there was no other way of escape, but that it was such a step as a reasonable man might take." Indifference manifested by defendant to the fate of Wilkinson, in not offering to rescue him from drowning, when by reasonable efforts his life might have been saved, was a pregnant circumstance, from which the intentions of defendant as to the deceased, were to be inferred, and from which the jury might lawfully assume that he was actuated by malice or ill will.

The court further charged the jury, that "it was not necessary that the fatal result should have sprung from an act of commission; but if defendant omitted any act incumbent on him, from which death resulted to the deceased, if there was no malice, it was manslaughter; if there was malice, it was murder." The proposition is sometimes stated, that where one, by his negligence, has contrib-

uted to the death of another, he is guilty of manslaughter. *Reg. v. Levindall*, 2 Carr & K., 230. And it is no defense that the death of the deceased was caused by the negligence of others, as well as by that of the prisoner; for if the death of the deceased be caused, partly by the negligence of the prisoner, and partly by the negligence of others, the prisoner, and all those others, are guilty of manslaughter. *Regina v. Haines*, 2 Carr. & K., 368.

The master of a ship compelled a seaman to go aloft, in a state of great debility and exhaustion, when he could not go aloft without danger of death, or a serious bodily injury, which facts were known to the master, who nevertheless persisted in causing him to go aloft, and the seaman fell from the mast and was drowned. It was held, that if the jury believed that the circumstances were such, that the master must and ought to have foreseen the result, and that his conduct was persisted in from personal malice to the deceased, or from such a brutal malignity of conduct as evinced a heart regardless of social duty, and fatally bent on mischief, the defendant was guilty of murder; but if the jury believed there was no actual malice to the deceased, nor constructive malice, arising from brutal malignity, still, if the circumstances showed gross heedlessness, want of due caution, or the unreasonable exercise of authority on the part of the master, he was guilty of manslaughter. *The United States v. Freeman*, 4 Mason, 505; *The United States v. Warner*, 4 McLean, 463; 1 Bishop's Cr. Law, sec. 230.

The defendant moved the court for a new trial; and, among other causes, alleged that one of the jurors, Shafer, had expressed an unqualified opinion and belief, before the trial, and before he was called as a juror, that the defendant was guilty of the crime charged against him. In support of the motion, affidavits of three persons were filed, who depose to having heard the juror, before the trial, express his opinion that defendant was guilty, and ought to be punished. The affidavit of the defendant was also put in, to the effect, that until after the trial, he had no knowledge

that the said Shafer had, previously to the trial, expressed the opinion or belief, that he was guilty of the offense charged; and that the said Shafer, on his examination on oath, before he was sworn as a juror, stated that he had not either formed or expressed an opinion or belief, that defendant was guilty, or not guilty. Besides this affidavit of the defendant, there is nothing to show that the juror was examined, before he was sworn as a juror, to ascertain whether or not, he had formed or expressed an opinion as to the guilt, or innocence of defendant.

The defendant's affidavit was not sufficient for that purpose. The challenge is required, by the statute, to be taken when the juror appears, and before he is sworn, unless the court permit it to be taken after the juror is sworn, and before the jury is completed. Code, section 2979. If the juror had been examined before he was sworn, and upon such examination, had stated that he had not formed or expressed an unqualified opinion or belief, that the defendant was guilty or not guilty, of the offense charged, though not among the causes enumerated in the Code for which a new trial may be granted, yet if it should afterwards appear that the juror had sworn falsely, and that he had, in fact, formed or expressed an opinion that the defendant was guilty, we think it would afford good cause for granting a new trial. But defendant, to take advantage of such fact, must show, by the record, that the juror was examined on oath, as to whether he had formed such opinion or belief; and if it is not shown that he was so examined, it is no ground for a new trial, that the juror's opinion was made up beforehand.

The motion in arrest of judgment, was based upon the following reasons: 1. That the court to which said indictment was presented, was not held at the place fixed by law for holding the same, at the time in the term when the same was presented. The record shows that the indictment was presented to the court, while the same was sitting at the "University building" at Iowa City, although there was

then a regular court-house at Iowa City, for the county of Johnson. It further shows that the said court-house was in a somewhat ruined and dilapidated condition ; that the court was first convened at the court-house, and owing to the condition of the same, adjourned to the University building. All courts must sit at the places designated for that purpose, pursuant to statute, unless, by common consent, some other place is fixed upon. Code, section 1597. Where the county is not provided with a regular court-house, and if no suitable place be provided by the county court, the district court may direct the sheriff to procure one. Code, sections 1573, 1574.

We think the record shows enough to justify this court in assuming, that the court-house, owing to its ruined and dilapidated condition, was an improper place for holding court; and that the county court provided, for the use of the court the University building, or failing to provide any place, the said building was provided by the sheriff, for the use of the court.

2. That the court had no jurisdiction to try the defendant, because a change of venue had been granted by the court to F. M. Irish, a defendant jointly indicted with said Shelledy, and the court had directed that said Irish be tried in Scott county, before the trial of the present defendant was commenced. It is urged by defendant, that as the law requires that the clerk shall make out and certify a transcript of all the proceedings appearing upon the record of the court, which, together with the indictment, and all the papers in the cause, must be transmitted to the clerk of the court, to which venue has been changed, (Code, sec. 3273), that no trial of the defendant, Shelledy, can be had in Johnson county, when it is to be presumed that the indictment has been sent to Scott county, for the trial of Irish, as the law requires. This court will not presume that the district court of Johnson county undertook to try the present defendant, without the indictment ; and as he did not apply for a change of venue, and none was directed as to him, we think he was properly tried in Johnson county.

3. The third ground of the motion in arrest of judgment is, that the second count of the indictment is bad; that there was a general verdict of guilty, without reference to any particular count; and that the court could not render any judgment on the verdict, where there was one defective count. It will not be necessary for us to inquire, whether the second count is bad. It is not claimed that the counts are all bad. We are satisfied, that where there is a general verdict of guilty, on an indictment containing several counts, if any one of them is good, the judgment will be supported. *Regina v. Ingram*, 1 Salkeld., 384; *Grant* v. *Astle*, Douglas, 730; *The U. S.* v. *Bowers*, 5 Wheaton, 206; *The People* v. *Curling*, 1 Johnson, 322; *The People* v. *Wiley*, 3 Hill, 213; *Hudson* v. *State*, 1 Blackf., 318; 1 Arch. Cr. Plead. & Ev., 175; 1 Chitty Cr. Plead., 249.

The next assignment of error, is for the reason that it does not appear that the district court, at each adjournment, during the progress of the trial, admonished the jury that it was their duty not to converse among themselves, on any subject connected with the trial, nor to form or express any opinion thereon, until the cause was finally submitted to them. It is not necessary that this should appear affirmatively from the record. It is presumed that the district court did its duty; and unless the contrary is made to appear, affirmatively, the judgment will not be disturbed.

It is the opinion of the majority of the court, that there is no error shown in the proceedings of the district court, and the judgment is affirmed.